IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DENNIS ABBOTT, et al., )<br>    Plaintiffs, )<br> )<br>v. )<br> )<br>AUSTAL USA, LLC, )<br>    Defendant. ) | Civil Action No. 1:22-cv-00267-KD-C |

## ORDER

This action is before the Court on the Motion for Summary Judgment as to the claims of Plaintiff Antonio Ross ("Ross"), (Doc. 233), and the Brief in Support, (Doc. 234), filed by Defendant Austal USA, LLC ("Austal"); the Response, (Doc. 253), filed by Ross; and Austal's Reply, (Doc. 259). This action involves the claims of numerous Plaintiffs under a variety of theories regarding Austal's vaccine mandate during the COVID-19 pandemic. This order addresses the claims of **Plaintiff Antonio Ross**. Upon consideration, and for the reasons below, the motion is **GRANTED**.

### I.   Findings of Fact[1]

### A.   Austal USA, LLC

Austal is a federal contractor as it contracts with the United States Navy to build ships. At all relevant times, Austal has had in place an Equal Employment Opportunity policy, which prohibits discrimination based on protected characteristics including religion. The policy directed employees who believed that they had been subjected to discrimination or harassment to report it to Human Resources. During the relevant time period, Rusty Murdaugh ("Murdaugh") was Austal's president; Mike Bell ("Bell") worked as Vice President of Operations; Sandra Koblas

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

("Koblas") was Vice President of Human Resources; Samuel Cordts ("Cordts") was Director of Health and Safety; Rodney Patrick was the Employee Relations Manager; Ryan Lee ("Lee") was Senior Manager of Training and Organizational Development; Bridget Jewett was a Human Resources Business Partner; and Jeanette Whatley was an Occupational Nurse Coordinator.

### B. Ross's Position at Austal

While at Austal, Ross worked as an A class pipe welder and then a technical training instructor where he tested employees and provided on-the-job training. This position required Ross to work regularly with others on his team or crew. Ross also regularly attended start of shift meetings with his crew, which was comprised of a number of other employees.

### C. COVID-19 Pandemic and Austal's Response

The World Health Organization ("WHO") declared COVID-19 as a pandemic on March 11, 2020. National Library of Medicine, https://pmc.ncbi.nlm.nih.gov/articles/PMC7569573/ (last visited Dec. 2, 2024). Austal was still considered an essential employer, given that it was charged with building ships for the United States Navy. As such, Austal provided to employees who had immune issues or otherwise had concerns regarding the pandemic with leave in the Spring of 2020. Austal, where possible, put into place social distancing requirements. Austal required employees to wear masks and provided masks to employees. Austal provided hand sanitizer to employees. Austal employed cleaning crews to perform extra cleaning, particularly in areas where an employee had tested positive for COVID-19. Austal tracked COVID-19 cases by work area in an effort to engage in contact tracing. Employees who tested positive for COVID-19, or who were exposed to COVID-19, were required to quarantine consistent with Centers for Disease Control ("CDC") requirements.

### D. Federal COVID-19 Vaccine Mandate and Austal's COVID-19 Vaccine Mandate

On September 9, 2021, President Joe Biden signed Executive Order 14042 ("EO 14042"). See Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 FR 50985 (Sep. 9, 2021). EO 14042 established a requirement that all federal contractor employees be vaccinated. Id. EO 14042 directed the Federal Workforce Task Force to develop workplace COVID-19 safety standards with which federal contractors governed by the EO would have to comply. Id. In turn, the Task Force issued guidance on September 24, 2021, requiring the contractors to mandate that their employees be fully vaccinated (meaning, two weeks after receiving the Johnson & Johnson/Janssen vaccine or the second dose of the Pfizer or Moderna vaccine) by December 8, 2021, unless granted an exemption. New Guidance on COVID-19 Workplace Safety for Federal Contractors, WHITE HOUSE https://www.whitehouse.gov/omb/briefing-room/2021/09/24/new-guidance-on-covid-19-workplace-safety-for-federal-contractors/ (last visited Dec. 3, 2024).

On or about November 5, 2021, the Occupational Safety and Health Administration ("OSHA") issued an Emergency Temporary Standard ("ETS") that would require employers of 100 or more employees to perform periodic testing of unvaccinated employees. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 FR 61402 (Nov. 5, 2021). That ETS was ultimately withdrawn by OSHA in January 2022. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 87 FR 3928-01 (Jan. 26, 2022).

Shortly before entry of EO 14042, Austal implemented a mandatory vaccination policy for Austal's leadership, which required those employees to be vaccinated by October 8, 2021. The October 8, 2021, deadline was later extended to align with the federal mandate of EO 14042.

On October 1, 2021, Austal issued a communication to its workforce regarding the federal mandate. In that communication, employees were informed that Austal was subject to the federal

mandate and that all employees were required to receive and report receipt of the Johnson & Johnson/Janssen vaccine or their first shot of the Pfizer or Moderna vaccine by October 27 and the second doses of the Pfizer or Moderna vaccine by November 24. In that same communication, Austal informed its employees that any employee who had a disability, who was pregnant, who was a nursing mother, who had a qualifying medical condition contraindicating vaccination, or who objected to being vaccinated on the basis of a sincerely-held religious belief/practice could request an exemption from the vaccination.

Austal hosted onsite vaccination clinics on October 7, 8, 14, 15, 21, 22, 26, and 27 in an effort to assist employees in obtaining the vaccination. On October 5, 2021, Austal provided employees with specific instructions on how to request an exemption. The internal deadline set for the submission of religious exemption requests was October 15, 2021.

Austal also required unvaccinated workers—but not vaccinated employees—to wear masks. And Austal allowed only vaccinated employees to wear stickers indicating that they were vaccinated.

**E. Accommodation/Exemption Process for Medical Exemptions**

Human Resources provided each employee requesting an exemption with a request form. The form asked the employee to provide information about the medical condition precluding vaccination. As part of the evaluation process, Human Resources met with each employee's management/supervisory team to discuss the employee's job interactions with others (such as co-workers, managers, and customers). The information gathered was used to determine what, if any, safety protocols the employee would have to follow if his/her request for exemption was granted.

### F. Ross's Requests for Accommodation/Exemption

Ross did not file a religious exemption request. Ross did file a medical exemption request with Human Resources that included a letter from the FDA and the statement that he was requesting exemption based on his active antibodies.

Ross was "open" about not getting the vaccine. (Doc. 220-1 at 8). When asked whether he discussed his vaccination outside of conversations with his wife and folks at work, Ross responded: "If the subject was brought up. It's really nobody's business, in my opinion. I don't just go around just talking to people, hey, I'm not getting the vaccine." (Doc. 2021-1 at 9).

### G. Austal's Attempts to Accommodate

Ross communicated with Human Resources via email regarding his submission. Human resources noted that his request documentation was insufficient and that documentation from a medical provider was required. Ross did not provide any medical documentation to Austal.

Austal considered all medical exemption requests on an individual basis. In total, Austal received almost 160 religious exemption requests. Human Resources interviewed the management/supervisory teams of all employees but determined that no employee worked in isolation and that each employee had regular interactions with other employees.

Lee sought health and regulatory guidance on how to preserve employee safety and health if they were not vaccinated. Lee consulted with medical and health personnel both at the University of South Alabama and the Mobile County Health Department. Through those discussions, and in consideration of the anticipated OSHA ETS, Austal determined that unvaccinated employees would be required to submit to bi-weekly onsite testing provided by Austal, as well as continued masking and social distancing where possible.

In an effort to evaluate the feasibility of a bi-weekly onsite testing program, Austal assessed the cost, mechanics, and logistics of how the program would work for the nearly 160 employees requesting religious exemptions—while bearing in mind that Austal could not require employees to pay for their own tests. Lee assembled a spreadsheet that took into account the cost of the test itself, the fact that the employees would be on-the-clock for the approximate thirty minutes of testing, the costs of administrative labor in supervising and tracking testing, and the projected costs of false positives that would mandate added testing utilizing a medical services vendor and employee time off work. Lee and Austal took into account that administration of the testing program would require, among other things, additional reporting to check the shift/status/attendance of the unvaccinated employee, communications with the employee's supervisor, managing potential non-compliance with testing requirements, preparing tests and testing sites, witnessing tests, and logging and tracking test results.

Based on the calculations, Austal was facing an approximate cost in excess of $1,000,000.00 per year to perform bi-weekly testing, aside from the administrative costs. In consideration of this estimate, the potential administrative issues, and the obligation to protect the health of its employees, Austal determined that a bi-weekly testing program would pose a significant undue hardship on the company and that there was no other feasible method to accommodate those seeking religious exemptions from the vaccine requirement. Austal looked at what it could accommodate and granted some medical exemptions but denied all religious exemptions. Austal did not meet with any of the employees requesting a religious exemption before denying their requests.

### H. Ross's Termination and Lawsuit

Ross returned to work from a vacation on October 27, 2021. That same day, Lee asked Ross if he was going to get the vaccine, and Ross said no. Lee asked Ross to surrender his badge, and Ross left. Ross also told Lee that he had another job. No one told Ross that he was being terminated because of a medical condition or disability.

Ross's operative complaint alleges (1) that Austal violated the ADA, 42 U.S.C. § 12101E by failing to accommodate his disability; (2) that Austal was negligent in the way it handled the COVID-19 pandemic; and (3) that Austal invaded his privacy by inquiring about his vaccination status. (Doc. 94-1).[2]

### II.    Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the

---

[2] The Court previously adopted the Report and Recommendation of the Magistrate Judge, (Doc. 110), which dismissed the remaining counts of the amended complaint. (Doc. 114).

nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

**III.    Analysis**

Ross alleges three causes of action against Austal: (1) failure to accommodate his medical condition under the ADA; (2) negligent handling of the COVID-19 pandemic; and (3) invasion of privacy. (Doc. 94-1). Austal moves for summary judgment as to all of Ross's claims.

Ross concedes that all of his claims except his state law claim for invasion of privacy are "due to be dismissed." (Doc. 253 at 10). Therefore, summary judgment is **granted** in favor of Austal as to Ross's claims for an **ADA violation** and for **negligence**. The remaining question is whether summary judgment is proper on the invasion of privacy claim.

**A. Invasion of Privacy**

"Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy." Butler v. Town of Argo, 871 So. 2d 1, 12 (Ala. 2003). Invasion of privacy consists of four distinct wrongs: (1) intrusion on seclusion; (2) public disclosure of private information; (3) false light; and (4) appropriation for commercial use. Id. Ross argues that he has a claim for the second form: public disclosure of private information which violates ordinary decency. (Doc. 253 at 6).[3]

Ross contends that Austal publicly disclosed his private information regarding his vaccination status in two ways. *First*, by requiring unvaccinated employees—but not vaccinated employees—to wear masks. (Doc. 222-9 at 6). *Second*, by allowing only vaccinated employees to wear stickers. (Doc. 222-9 at 33; Doc. 218-1 at 7).

Public disclosure of private information is an actionable tort when the matter publicized is of a kind that: "(a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Ex parte Birmingham News, Inc., 778 So. 2d 814, 818 (Ala. 2000) (quoting Restatement (Second) of Torts § 652D (1977)). Austal argues that Ross's public disclosure theory regarding his vaccination status fails on both elements.

*First*, Austal argues that the disclosure of Ross's vaccination status was not highly offensive to a reasonable person because Ross openly discussed his vaccination status to others, including those at work. In support, Austal cites Hill v. Branch Banking & Tr. Co., 264 F. Supp. 3d 1247, 1267 (N.D. Ala. 2017) (granting summary judgment for employer on invasion of privacy claim because plaintiff publicly discussed the information in question with her coworkers). *Second*, Austal argues that the COVID-19 pandemic and the vaccine were matters of public concern.

---

[3] Ross concedes that he does not have a viable claim under the first, third, and fourth forms. (Doc. 253 at 6).

9

In response, Ross provides four reasons why he believes Austal invaded on his privacy. *First*, his invasion of privacy is specific to him. *Second*, Austal did not provide specifics as to the timing of Ross's alleged disclosures. *Third*, it is not clear whether Ross discussed his vaccination status with only those already aware of it or with those who had prior knowledge. *Fourth*, there was not a legitimate health interest in disclosing Ross's vaccination status.

Ross also cites Horne v. Patton: "When a patient seeks out a doctor and retains him, he must admit him to the most private part of the material domain of man. Nothing material is more important or more intimate to man than the health of his mind and body." 287 So. 2d 824, 830 (Ala. 1973) (quoting Hammonds v. Aetna Casualty & Surety Co., 243 F. Supp. 793, 801 (N.D. Ohio 1965)). Ross's reliance on this quote, however, is misguided. Horne, and the case Horne quoted, involved a doctor revealing information that the plaintiff provided to the doctor during treatment. See Horne, 287 So. 2d at 825; Hammonds, 243 F. Supp. at 795. Here, Austal does not have the same doctor–patient relationship with Ross. Moreover, the Horne court explained that "[i]f the defendant doctor in the instant case had a legitimate reason for making this disclosure under the particular facts of this case, then this is a matter of defense." Horne, 287 So. 2d at 831.

Ross's admission that he was "open" with the fact that he was not getting the vaccine likely shows that he publicly discussed the topic of his invasion of privacy claim. See Hill v. Branch Banking & Tr. Co., 264 F. Supp. 3d 1247, 1267 (N.D. Ala. 2017) (plaintiff publicly discussed the topics of the invasion of privacy claim). Regardless, Ross's invasion of privacy claim fails on the second element because COVID-19 involved a matter of legitimate public concern.

The Second Restatement of Torts provides: "When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy." Restatement (Second) of Torts § 652D (1977). For example, in Middlebrooks v. State Board of Health, an Alabama law required the

disclosure of information regarding HIV and AIDS patients, including names and addresses of persons infected. Middlebrooks v. State Bd. of Health, 710 So. 2d 891, 891 (Ala. 1998). The Alabama Supreme Court explained that the disclosure of this information was not an invasion of privacy because "the prevention of the spread of HIV and AIDS is a legitimate governmental interest." Id. at 892–93.[4]

Ross argues that Austal did not have a legitimate interest in knowing his vaccination status for two reasons. *First*, "the vaccine does not prevent an individual from getting COVID, nor does it prevent an individual from spreading COVID." (Doc. 253 at 9). Ross quotes a CDC article which states that "[v]accines are not always effective at preventing infection . . . ." and clarifies that the "purpose of the vaccine" is to provided sustained protection against disease and death. 5 Things You Should Know about COVID-19 Vaccines, CDC (Oct. 13, 2023, 2:00 PM), https://www.cdc.gov/ncird/whats-new/5-things-you-should-know.html (last visited Dec. 4, 2024). *Second*, Austal's mask policy of only requiring the unvaccinated to wear masks is contrary to OSHA guidance. Ross quotes a Frequently Asked Questions ("FAQs") webpage from OSHA which states: "In areas with substantial or high transmission, employers should provide face

---

[4] The Alabama Supreme Court relied on the Westinghouse factors from a Third Circuit case to determine that the disclosure was justified. Middlebrooks, 710 So. 2d at 891. In Westinghouse, the court explained:

> The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

United States v. Westinghouse Electric Corp., 638 F.2d 570, 578 (3d Cir.1980).

coverings for all workers, as appropriate, regardless of vaccination status." Frequently Asked Questions, OSHA https://www.osha.gov/coronavirus/faqs (last visited Dec. 5, 2024). For the same reasons, Ross argues that Austal had no legitimate interest in knowing who was required to wear a mask through its sticker policy.

Ross's arguments concerning Austal's interest in its mask and sticker policy are not persuasive. To start, the CDC article upon which Ross relies was published in October 2023, and there is no date associated with the OSHA FAQ webpage. Therefore, these sources do not prove that Austal lacked a legitimate interest in its mask and sticker policy at the time in question. More importantly, the sources do not support Ross's argument. For example, the OSHA FAQs guide employers to "provide" masks for all workers, "regardless of vaccination status." Frequently Asked Questions, supra. They also note that employers "can suggest or require" that (1) unvaccinated individuals wear masks in public workplaces and that (2) all individuals wear masks in public, indoor settings of high transmission. Id. But it does not support Ross's argument that employers lack a legitimate interest in requiring unvaccinated workers to wear masks. Furthermore, the latter half of the CDC article quoted by Ross explains that "there is extensive data showing that these vaccines prevent severe illness and protect the public's health." 5 Things You Should Know about COVID-19 Vaccines, supra.

To determine whether Austal's mask and sticker policy was of legitimate public concern, the Court must balance the competing interests of Austal and Ross. Austal had an interest in maintaining the health and safety of its workforce. Austal's actions were based on the obvious risks of COVID-19, objective data, and federal mandates regarding vaccinations. On the other hand, Ross desired to remain unvaccinated and to keep his vaccination status private. At the time, the prevention and spread of COVID-19 was, as a matter of law, a matter of public concern. Austal

relied on objective data to determine that vaccinations and masking would protect its interests, and the interests of its employees. The potential harm to Ross—the fact that other employees could infer that Ross was unvaccinated—does not outweigh the public interest in requiring unvaccinated workers to wear masks. Therefore, summary judgment is **granted** in favor of Austal as to the **invasion of privacy claim**.

### IV.     Conclusion

Ross alleges three causes of action against Austal: (1) failure to accommodate his medical condition under the ADA; (2) negligent handling of the COVID-19 pandemic; and (3) invasion of privacy. Ross concedes that his ADA claim and his negligence claim are due to be dismissed. Moreover, no reasonable jury could find in favor of Ross on his invasion of privacy claim. Therefore, summary judgment is **granted** in favor of Austal as to all of Ross's claims.

**DONE** and **ORDERED** this **3rd** day of **January 2025.**

  /s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**